UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____7/22/2019

The New York Times Company and Kenneth
P. Vogel,

                                 Plaintiffs,

            -against-

United States Department of Justice,

                                 Defendant.

1:18-cv-02095 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

Plaintiffs The New York Times Company and Kenneth P. Vogel, a reporter for The New York Times (together, "Plaintiffs"), bring this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq*., against the United States Department of Justice ("DOJ"), seeking the release of certain correspondence by DOJ's Foreign Agents Registration Act ("FARA") Registration Unit ("FARA Unit") and DOJ's Office of the Inspector General ("OIG") relating to employees, representatives and officials of: (1) the European Center for a Modern Ukraine; (2) the Ukrainian Party of Regions; (3) Inovo BV and Flynn Intel Group; and (4) the Human Rights Accountability Global Initiative Foundation and/or Prevezon Holdings (collectively, the "Enumerated Persons") over certain specified time periods between February 2015 and the present. (Am. Compl., ECF No. 13, ¶¶ 13-15.) Before the Court are the parties' cross-motions for partial summary judgment. (*See* Def.'s Notice of Mot., ECF No. 42; Pls.' Cross Mot., ECF No. 45.) For the reasons set forth below, DOJ's motion is GRANTED and Plaintiffs' cross-motion is DENIED.

**BACKGROUND**

I.      **The Foreign Agents Registration Act**

FARA requires persons acting as agents of foreign principals, who engage in political, quasi-political or public relations activities, to register with DOJ and to disclose their activities, receipts and disbursements. *See* 22 U.S.C. § 611 *et seq.* DOJ uses FARA as a "national security tool" in order to "identify foreign influence and threats to the United States political process[,]" including "hostile intelligence or influence operations[.]" (Decl. of Patrick N. Findlay, dated Nov. 9, 2018 ("Public Findlay Decl."), ECF No. 43, ¶ 18.); *see also Meese v. Keene*, 481 U.S. 465, 469 (1987) (FARA's "basic purpose" is "to protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure" by lobbyists working on behalf of foreign governments "so that the government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities.") (quoting *Viereck v. United States*, 318 U.S. 236, 244 (1943). DOJ's FARA Unit, located within the Counterintelligence and Export Control Section of the National Security Division ("NSD"), is responsible for administrative enforcement of FARA. (Public Findlay Decl. ¶ 17.) The FARA Unit also partners with local United States Attorney's Offices and other DOJ components to enforce FARA through civil enforcement proceedings or criminal proceedings for willful violations. (*Id.*)

II.     **The Enumerated Persons**

The requested records relate to individuals and entities affiliated with President Donald Trump's campaign during the 2016 presidential election, including Paul J. Manafort, Jr. ("Manafort"), Richard W. Gates III ("Gates") and Michael Flynn ("Flynn"). (Pl. Mem. at 1-5.)

Between approximately 2005 and 2015, Manafort and Gates engaged in lobbying activities in the United States on behalf of the Ukrainian government, and various Ukrainian politicians and political parties, including the Ukrainian Party of Regions, through Manafort's consulting companies Davis Manafort Partners, Inc. ("DMP") and later DMP International, LLC ("DMI")). (Pls.' 56.1 Statement, ECF No. 52, ¶¶ 1-5.)[1] Manafort and Gates used the European Centre for a Modern Ukraine, in part, to carry out their activities. (*Id.* ¶ 5.) In March 2016, the Trump campaign hired Manafort as an adviser. (*Id.* ¶ 9.) Manafort resigned from the campaign in August 2016 and, in June 2018, Manafort retroactively registered DMI under FARA. (*Id.* ¶¶ 13-14.) In 2018, Manafort pleaded guilty to, among other things, conspiracy to violate FARA by failing to register and by providing false statements in a document filed with FARA. *See* Recent FARA Cases, https://www.justice.gov/nsd-fara/recent-cases (last visited July 19, 2019) ("Recent FARA Cases"). Gates also pleaded guilty to, among other things, conspiracy to violate FARA by failing to register and by providing false statements in a document filed with FARA. (*Id.*)

In 2015, Michael Flynn and two associates founded the Flynn Intel Group. (Pls.' 56.1 Statement ¶ 15.) The Flynn Intel Group was hired by Inovo BV to conduct lobbying efforts on behalf of the Turkish government. (*Id.* ¶ 16.) In November 2016, Flynn was selected by President-Elect Trump to serve as National Security Advisor. (*Id.* ¶ 18.) Flynn resigned from that position in February 2017. (*Id.* ¶ 20.) In March 2017, Flynn registered under FARA. (*Id.* ¶ 21.) In 2017, Flynn pleaded guilty to making false statements to the FBI pertaining to his communications with the Russian Ambassador to the United States. *See* Recent FARA Cases. "In the Statement of Offense

---

[1] As DOJ asserts, a Local Rule 56.1 Statement is not required in a FOIA case. *See, e.g., Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 44 n.11 (S.D.N.Y. 2018). Nonetheless, the Court cites to Plaintiffs' 56.1 Statement for background information to put Plaintiffs' FOIA requests in context.

filed with his plea agreement, Flynn admitted to making materially false statements in multiple documents filed pursuant to FARA in conjunction with worked performed by him and his company for the principal benefit of the Republic of Turkey." *Id.*

The Human Rights Accountability Global Initiative Fund ("HRAGIF") is a Delaware nongovernmental organization. (Pls.' 56.1 Statement ¶¶ 25, 29-30.) In a complaint filed by Hermitage Capital Management with the FARA Unit in July 2016, HRAGIF and Prevezon Holdings Limited ("Prevezon"), a Russian-owned, Cyprus-based company, were alleged to have conducted lobbying in the United States on behalf of the Russian government in their effort to seek to amend and possibly repeal the Magnitsky Act[2] without complying with FARA's registration requirements. (*Id.* ¶¶ 29-30.)

---

[2] The Magnitsky Act is named after Sergei Magnitsky, a Russian lawyer who investigated and uncovered a tax fraud scheme.

> The gist of the scheme was that Russian officials and others raided and took control of certain companies owned by an American-run investment firm called the Hermitage Fund. After installing themselves at the former Hermitage companies, these individuals faked contracts between the Hermitage companies and certain sham companies that they also created. These contracts indicated that the former Hermitage companies owed the sham companies large sums of money. The sham companies then sought and won judgments against the former Hermitage companies to recoup these falsified losses; as a result, the Hermitage companies altered their balance books for the previous years to show a loss. The former Hermitage companies (still controlled by the fraudsters) then sought tax refunds based on their revised books, which the Russian government paid out. The corporate raiders then transferred these funds from the Hermitage companies to their personal bank accounts hidden across the globe.

> Hermitage . . . hired Magnitsky to investigate. After Magnitsky uncovered the fraud, Russian authorities arrested and jailed him—not the fraudsters. Magnitsky was tortured and eventually died after being denied medical treatment.

> As a result, the United States Congress passed the Magnitsky Act, which sanctions individuals involved in the tax fraud, Magnitsky's death, and other human rights violations in Russia.

> Among its other strictures, the Magnitsky Act prohibits the transfer of property to people who were involved with the tax fraud that led to Magnitsky's death. . . .

### III. Plaintiffs' FOIA Requests And Government Response

On August 8, 2017, Plaintiffs submitted four FOIA requests to DOJ, three directed to the FARA Unit and one directed to OIG, seeking records related to the Enumerated Persons. (*See* Am. Compl. Exs. A-D, ECF Nos. 13-1 to 13-4.) The first request sought copies of correspondence between employees and officials of the FARA Unit and employees and officials of the United States Congress related to the Enumerated Persons for specified time periods.[3] (Am. Compl. Ex. A, ECF No. 13-1.) The second request sought copies of internal correspondence between employees and officials of the FARA Unit related to the Enumerated Persons for the specified time periods. (Am. Compl. Ex. B, ECF No. 13-2.) The third request sought copies of correspondence between employees and officials of the FARA Unit and representatives of the Enumerated Persons for the specified time periods. (Am. Compl. Ex. C, ECF No. 13-3.) The fourth request sought copies of correspondence between employees and officials of OIG, as well as correspondence between employees and officials of OIG and employees and officials of the FARA Unit or the United States Congress, related to the Enumerated Persons for the specified time periods. (Am. Compl. Ex. D, ECF No. 13-4.) Plaintiffs sought expedited processing for each of the requests, arguing that the information sought was "of widespread and exceptional media interest and involve[d] questions which could affect public confidence about [DOJ's] integrity in enforcing [FARA.]" (Am. Compl. Exs. A-D, ECF Nos. 13-1 to 13-4.)

---

*Deposit Ins. Agency v. Leontiev*, No. 17-MC-00414 (GBD) (SN), 2018 WL 3536083, at *5 (S.D.N.Y. July 23, 2018) (citations omitted).

[3] For the European Center for a Model Ukraine and the Ukrainian Party of Regions, the requests sought documents between February 2015 and the present. For Inovo BV and Flynn Intel Group, the requests sought documents between June 2016 and the present. For HRAGIF and Prevezon, the requests sought documents between June 2015 and the present. (Am. Compl. Exs. A-D, ECF Nos. 13-1 to 13-4.)

On August 30, 2017, a Government Information Specialist from NSD acknowledged receipt of the three requests directed to the FARA Unit. (Am. Compl. Ex. E, ECF No. 13-5.) However, DOJ denied expedited processing, stating that Plaintiffs had not met the standard for a "compelling need." (*Id.*) Plaintiffs appealed the denial of expedited processing as to the first and third requests. (Decl. of John Langford, dated Dec. 14, 2018 ("Langford Decl.") Exs. R & S, ECF Nos. 51-17 & 51-18.) On September 8, 2017, a Government Information Specialist from OIG acknowledged receipt of the request directed to it. (Langford Decl. Ex. U, ECF No. 51-20.) On October 18, 2017, DOJ granted Plaintiffs' appeal and remanded the requests to NSD to process "as quickly as practicable." (Am. Compl. Ex. G, ECF No. 13-7.)

On March 8, 2018, Plaintiffs filed the instant action to compel disclosure of responsive records. (*See* Compl., ECF No. 5.) As of that date, Plaintiffs had not received any records or further communication from NSD or OIG regarding the requests. (*Id.* ¶¶ 19, 22.) On March 13, 2018, OIG responded to the request directed to it, reporting that the agency had conducted a search for responsive records, but had found none. (*See* Am. Compl. Ex. H, ECF No. 13-8.)

Plaintiffs filed an Amended Complaint on April 3, 2018 (Am. Compl., ECF No. 13) and DOJ filed its Answer on April 26, 2018. (Answer, ECF No. 18.) As part of the Amended Complaint, Plaintiffs alleged that during the covered period the Senate Committee on the Judiciary and Subcommittee on Crime and Terrorism communicated with OIG on matters related to FARA, and thus, asserted that OIG's failure to locate any responsive records indicated that OIG failed to conduct a reasonable search. (Am. Compl. ¶¶ 26-27.)

Following the filing of DOJ's Answer, the Court ordered DOJ to begin a rolling production of documents responsive to the two FOIA requests for which DOJ previously determined that

expedited processing was warranted (the first and third requests) and, no later than May 10, 2018, to file a letter regarding the status of each of the four FOIA requests, as well as a timeline for completing production of documents responsive to the two expedited requests. (Order, dated April 26, 2018, ECF No. 19.)

On May 10, 2018, DOJ filed a letter indicating that it had located approximately 300 documents responsive to the expedited requests, and was releasing 26 pages subject to redaction based on Exemptions 6 and 7(C).[4] (Letter, dated May 10, 2018, ECF No. 20; *see also* Public Findlay Decl. Ex. E.) As for the OIG request, DOJ stated that OIG previously did not search its controlled correspondence records, which was the location where correspondence with Congress would be held, but was conducting a follow-up search. (*Id.*) In addition, DOJ sought additional time to review an additional set of records and conduct further searches, which the Court approved. (Order, dated May 15, 2018, ECF No. 22.)

On June 1, 2018, DOJ reported that OIG located the Senate letter referenced in the Amended Complaint, which it stated had been misfiled, but had located no new records. (Letter, ECF No. 23.) On July 10, 2018, NSD issued its second response to the three requests directed to the FARA unit, releasing 17 additional pages and stating that it was withholding 277 pages of documents in full pursuant to Exemptions 4, 6, 7(A), 7(C) and 7(F). (Public Findlay Decl. Ex. F.) On September 12, 2018, NSD issued its final response to the three FARA Unit requests, withholding

---

[4] The parties agreed to stay briefing on the propriety of these exemptions pending the outcome of the instant motions as to the applicability of Exemption 7(A). (*See* Pl. Mem. at 8 n.1.)

1,810 emails and one DVD of documents in full pursuant to Exemption 7(A)[5] and reserving its

right to assert additional exemptions.[6] (Public Findlay Decl. Ex. G.)

On November 9, 2018, the parties filed a proposed Stipulation and Order, stipulating that

DOJ had conducted an adequate search for the records responsive to all four of Plaintiffs'

requests and reserving certain rights pending the outcome of their anticipated cross-motions for

summary judgment as to the applicability of Exemption 7(A). (Proposed Stipulation, ECF No. 40.)

The Court approved the proposed Stipulation the same day. (Memo Endorsement, dated Nov. 9,

2018, ECF No. 41.)

On November 9, 2018, DOJ filed its motion for partial summary judgment as to the

records withheld pursuant to Exemption 7(A). (Def.'s Notice of Mot., ECF No. 42.) In support of

its motion DOJ filed a Declaration by Patrick N. Findlay, the Acting Chief and Special Counsel of

the Office of Strategy Management and Development of NSD (Public Findlay Decl., ECF No. 43),

a Memorandum of Law (ECF No. 44) and an *ex parte* Declaration by Patrick N. Findlay for the

Court's *in camera* review. (*See* Notice of Filing, ECF No. 45.) The public Findlay Declaration

included a *Vaughn* index[7] classifying the withheld documents into six categories:

(1) correspondence between DOJ and counsel for Paul Manafort, Richard Gates and DMP;

---

[5] FOIA requires federal agencies to make their files generally available to the public unless the information withheld falls within one or more of nine specific exemptions. *See Azmy v. U.S. Dep't of Def.*, 562 F. Supp. 2d 590, 597 (S.D.N.Y. 2008).

[6] In preparing its motion for partial summary judgment, DOJ determined that, due to an overbroad search methodology, a limited number of internal emails were withheld that were not covered by Exemption 7(A). (Def. Mem. at 5 n.6.) DOJ produced these records on May 10, 2019. (*See* Letter Motion, dated June 3, 2019, ECF No. 73.)

[7] A *Vaughn* index lists titles and descriptions of withheld documents. *See New York Times Co. v. U.S. Dep't of Justice*, 762 F.3d 233, 237 (2d Cir.2014). "The purpose of a Vaughn index is to afford a FOIA plaintiff an opportunity to decide which of the listed documents it wants and to determine whether it believes it has a basis to defeat the Government's claim of a FOIA exemption." *Id.*

(2) correspondence between DOJ and counsel to Michael Flynn and Flynn Intel Group; (3) exhibits to the Hermitage Capital Management complaint; (4) documents pertaining to one or more law enforcement investigations; (5) documents on a DVD found in FARA Unit files; and (6) internal DOJ emails. (*See* Vaughn Index, Public Findlay Decl. Ex. H, ECF No. 43-8.)

Plaintiffs filed their cross-motion on December 14, 2018. (Cross Mot., ECF No. 49.) In support of their cross-motion, Plaintiffs filed a Memorandum of Law (ECF No. 50) and Declaration of John Langford (ECF No. 51), as well as a Local Rule 56.1 Statement. (ECF No. 52.) DOJ filed its opposition to Plaintiffs' cross-motion on February 15, 2019, including an *ex parte* Supplemental Declaration of Patrick Findlay. (Opp., ECF No. 59; Notice of Filing, ECF No. 60.) Plaintiffs filed their reply on March 8, 2019. (Reply Mem., ECF No. 61.) The Court held oral argument on April 3, 2019. (Hr'g Tr., ECF No. 71.)[8]

Following oral argument, the Court ordered DOJ to re-review the records set forth in categories 1-3, 4 and 6 of the *Vaughn* index in light of relevant developments to date and to produce any additional documents, or portions thereof, that it no longer contended were subject to Exemption 7(A). (Order, dated April 3, 2019, ECF No. 67.) In addition, the Court ordered DOJ to review the *ex parte* Findlay Declaration and Supplemental Findlay Declaration to determine whether any additional information contained in those Declarations could be publicly disclosed. (*Id.*)

On June 3, 2019, DOJ filed a status letter stating that it had completed a re-review of records over which it asserted Exemption 7(A) to consider the impact (if any) of "relevant

---

[8] After oral argument, in April 2019, the parties consented to conduct all proceedings before me, including the entry of final judgment. (Consent, ECF No. 68.)

developments" as of April 3, 2019 and of the public release of the redacted Special Counsel's report, but that it had not changed its assertions of Exemption 7(A) as a result of the review. (Letter Motion, dated June 3, 2019, ECF No. 73.)

On June 10, 2019, DOJ filed redacted versions of the previously *ex parte* Findlay Declaration and Supplemental Findlay Declaration, which provided additional public information regarding the types of documents withheld and DOJ's justification for continuing to withhold certain records in full. (*See* Redacted Findlay Decl., ECF No. 75-1; Redacted Supp. Findlay Decl., ECF No. 75-2.)

## LEGAL STANDARDS

### I. FOIA Generally

"FOIA was enacted 'to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'" *Azmy*, 562 F. Supp. 2d at 597 (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). "The statute requires federal agencies to make their files generally available to the public unless the information withheld falls within one or more of nine specific exemptions." *Id.* "A federal agency responding to a FOIA request must (1) conduct an adequate search using reasonable efforts, (2) provide the information requested, unless it falls within a FOIA Exemption, and (3) provide any information that can be reasonably segregated from the exempt information." *DiGirolamo v. Drug Enf't Admin.*, No. 15-CV-05737 (ALC), 2017 WL 4382097, at *3 (S.D.N.Y. Sept. 29, 2017) (citing 5 U.S.C. §§ 552(a)(3), 552(b)).

## II.  <u>Standard Of Review</u>

The Court reviews the applicability of a particular FOIA exemption *de novo. See Azmy*, 562 F. Supp. 2d at 597. The exemptions are construed narrowly, *see Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) ("To implement [the] presumption for disclosure, FOIA exemptions 'have been consistently given a narrow compass.'") (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)), and "doubts as to the applicability of [an] exemption must be resolved in favor of disclosure." *Florez v. Cent. Intelligence Agency*, 829 F.3d 178, 182 (2d Cir. 2016).

"Generally, FOIA actions are resolved through summary judgment procedures." *DiGirolamo*, 2017 WL 4382097, at *3 . "To prevail on a motion for summary judgment in a FOIA action, the government 'has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA.'" *Sorin v. U.S. Dep't of Justice*, 280 F. Supp. 3d 550, 557 (S.D.N.Y. 2017) (quoting *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)). Thus, "an agency is entitled to summary judgment when it has thoroughly searched for responsive records and has articulated reasonably detailed explanations why any withheld documents fall within an exemption." *Kuzma v. U.S. Dep't of Justice*, No. 13-CV-00675, 2016 WL 9446868, at *3 (W.D.N.Y. Apr. 18, 2016), *aff'd sub nom. Kuzma v. United States Dep't of Justice*, 692 F. App'x 30 (2d Cir. 2017) (citing *Carney*, 19 F.3d at 812.) Conversely, "[a] plaintiff is entitled to summary judgment in a FOIA case 'when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *Id.* (quoting *New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007)).

To carry its burden, an agency may rely on a *Vaughn* index or declarations/affidavits that describe "with reasonable specificity the nature of the documents at issue and the justification for nondisclosure." *Id.* (citing *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 481 (D.C. Cir. 1980)). "[T]he description provided in the affidavits must show that the information logically falls within the claimed exemption." *Id.* An agency also may rely on *ex parte* affidavits to supplement its public justification. *See, e.g., Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 507 (S.D.N.Y. 2010) (discussing withholding of documents pursuant to Exemption 1); *see also In re New York Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 410 n.4 (2d Cir. 2009) (noting how, in various types of proceedings, "courts seek to balance the need for transparency in the judiciary with the effective protection of sensitive information"). However, the agency should provide "the most thorough public explanation possible[.]" *Human Rights Watch v. Dep't of Justice Fed. Bureau of Prisons*, No. 13-CV-07360 (JPO), 2015 WL 5459713, at *14 (S.D.N.Y. Sept. 16, 2015) (quoting *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 568 (S.D.N.Y. 1989)) (additional citation omitted).

Agency affidavits, including a *Vaughn* index, are presumed to have been made in good faith. *See Carney*, 19 F.3d at 812. "Thus, the agency's justification is sufficient if it appears logical and plausible." *Am. Civil Liberties Union v. United States Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018), *as amended* (Aug. 22, 2018). "If the agency's submissions are facially adequate, summary judgment is warranted unless the plaintiff can make a showing of bad faith on the part of the agency or present evidence that the exemptions claimed by the agency should not apply." *Garcia v. United States Dep't of Justice, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) (citing *Carney*, 19 F.3d at 812); *see also Center for Constitutional Rights v. C.I.A.*, 765 F.3d 161,

166 (2d Cir. 2014) (agency declarations "are accorded a presumption of good faith," and "when such declarations are 'not controverted by either contrary evidence in the record nor by evidence of agency bad faith,' summary judgment for DOJ is warranted.") (citing *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009)).

### III.    Exemption 7(A)

Exemption 7(A) applies to records compiled for law enforcement purposes, the disclosure of which "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The purpose of this exemption is to "prevent harm to the government's case in court by not allowing litigants earlier or greater access to agency investigatory files than they would otherwise have." *New York Times Co. v. United States Dep't of Justice*, No. 14-CV-03776 (AT) (SN), 2016 WL 5946711, at *7 (S.D.N.Y. Aug. 18, 2016) (internal quotation omitted); *see also Mobil Oil Corp. v. Federal Trade Comm'n*, 430 F. Supp. 849, 852-53 (S.D.N.Y. 1977) (citing Remarks of Senator Hart, author of the 1974 Amendments to the FOIA, 120 Cong. Rec. S9329 (May 30, 1974)); *BuzzFeed, Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396, 405 (D.D.C. 2018) ("Exemption 7(A) reflects Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'") (quoting *Robbins Tire*, 437 U.S. at 224)).

In order to sustain its burden under Exemption 7(A), DOJ must show that "(1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." *New York Times Co.*, 2016 WL 5946711, at *7  (citing *Azmy*, 562 F. Supp. 2d at 605.) However, "[u]nder exemption 7(A) the government

is not required to make a specific factual showing with respect to each withheld document that disclosure would actually interfere with a particular enforcement proceeding." *Agrama v. Internal Revenue Serv.*, 272 F. Supp. 3d 42, 48 (D.D.C. 2017) (citing *Robbins Tire*, 437 U.S. at 234-35.) "Rather, federal courts may make generic determinations that, 'with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally interfere with enforcement proceedings.'" *Id.* (quoting *Robbins Tire*, 437 U.S. at 236). "Ultimately, the government must 'allow[ ] the court to trace a rational link between the nature of the document and the alleged likely interference.'" *New York Times Co.*, 2016 WL 5946711, at *7 (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 940 (D.C. Cir. 2003)).

## DISCUSSION

The issue before the Court is whether DOJ properly has withheld certain requested records in full pursuant to Exemption 7(A). The Court first will consider whether the records at issue were "compiled for law enforcement purposes[,]" which is required to invoke Exemption 7. *See Brennan Ctr. for Justice at New York Univ. Sch. of Law v. Dep't of Homeland Sec.*, 331 F. Supp. 3d 74, 97 (S.D.N.Y. 2018) ("Invoking Exemption 7 requires a threshold showing that the materials be records or information compiled for law enforcement purposes.") (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 148 (1989) (internal quotation marks omitted)). Then, the Court will consider, for each category of documents withheld, whether DOJ has met its burden to show that "production of the information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

## I.     The Records Were Compiled For Law Enforcement Purposes

"To show that particular documents qualify as 'records or information compiled for law enforcement purposes,' an agency must establish a rational nexus between the agency's activity in compiling the documents and its law enforcement duties." *Brennan Ctr.*, 331 F. Supp. 3d at 97 (internal citation omitted). "[L]aw enforcement purposes" under Exemption 7 includes both civil and criminal matters within its scope. *Tax Analysts v. I.R.S.*, 294 F.3d 71, 76 (D.C. Cir. 2002) (citing *Pratt v. Webster*, 673 F.2d 408, 420 n.32 (D.C. Cir. 1982)). Further, "law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law." *Human Rights Watch*, 2015 WL 5459713, at *5 (quoting *Pub. Emp. for Env't'l Responsibility (PEER) v. U.S. Section, Int'l Boundary and Water Comm'n,* 740 F.3d 195, 203 (D.C. Cir. 2014) (emphasis in original)). "The 'ordinary understanding' of the term 'includes . . . proactive steps designed to prevent criminal activity and maintain security.'" *Id.* (quoting *Milner v. Dep't of the Navy,* 562 U.S. 562, 582 (2011) (Alito, J., concurring)). In addition, "[t]he term 'compiled' in exemption 7 is broad; it requires only 'that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption.'" *Schwartz v. Dep't of Def.*, No. 15-CV-07077 (ARR) (RLM), 2017 WL 78482, at *12 (E.D.N.Y. Jan. 6, 2017) (quoting *PEER*, 740 F.3d at 203).

DOJ contends that the records were compiled for law enforcement purposes because "they were compiled for the purpose of enforcement of FARA through civil or criminal means" and because "FARA is a national security tool." (Def. Mem. L. in Support, ECF No. 44, at 8.) Plaintiffs argue that DOJ only has established that the FARA unit generally engages in law enforcement activities, but has not met its burden to "demonstrate a rational nexus between the

activity in compiling the specific documents at issue in this case and a law enforcement purpose." (Pl. Mem., ECF No. 50, at 19.) Plaintiffs further contend that DOJ's *Vaughn* index and public declaration are insufficient to demonstrate that all of the records withheld were compiled for law enforcement purposes. (*Id.*)

The Court agrees with Plaintiffs that, just because FARA is a national security tool, it does not mean that all documents created by the FARA Unit are compiled for law enforcement purposes. *See, e.g., Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) ("FBI records are not law enforcement records under FOIA simply by virtue of the function that the FBI serves.") (internal quotations and brackets omitted)*; see also Families for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 397 (S.D.N.Y. 2011) ("While ICE is unquestionably a federal law enforcement agency, not every document produced by ICE personnel has been 'compiled for law enforcement purposes' under FOIA."). Instead, "[c]ourts have generally interpreted Exemption 7 as applying to records that pertain to specific investigations conducted by agencies, whether internal or external, and whether created or collected by the agency—in other words, investigatory files." *Families for Freedom*, 797 F. Supp. 2d at 397 (citing cases).

However, DOJ does not argue that all records generated by the FARA Unit are compiled for law enforcement purposes, but instead argues that the requested records are analogous to records found in investigatory files because the withheld records consist entirely of intra-DOJ correspondence or correspondence with the Enumerated Persons, and thus were created in the course of ensuring compliance with FARA. (Opp. at 9-10.) DOJ therefore contends that the withheld records are operational records of the FARA Unit generated during the performance of its core operational activities. (*Id.* at 10.)

The Court finds that DOJ has met its burden to establish, as a threshold matter, that the records were compiled for law enforcement purposes. Plaintiffs, by their own admission, are seeking records related to whether the FARA Unit "has been effective in ensuring that certain individuals and entities have complied with [FARA]" (Am. Compl. ¶ 3), and, thus, the specific requests directly implicate the FARA Unit's law enforcement function. Moreover, DOJ confirmed in the public Findlay Declaration that "the withheld records referenced in the *Vaughn* index relate to one or more pending or prospective enforcement proceedings." (Public Findlay Decl. ¶ 19.)

DOJ is not obligated to supply additional facts to establish that the records were compiled for law enforcement purposes. *See Am. Civil Liberties Union Found.*, 833 F. Supp. at 406 (agency's statement that records were compiled as part of criminal investigations sufficient to establish that records were compiled for law enforcement purposes without further factual findings). Thus, the Court finds that there is a rational nexus between the FARA Unit's activity in compiling the withheld records and its law enforcement duties. *See New York Times Co.*, 2016 WL 5946711, at *13 (report regarding ongoing counter-terrorism investigation had rational nexus to the agency's law-enforcement duties and was, therefore, compiled for law enforcement purposes); *see also Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 387 (S.D.N.Y. 2014) (Customs and Border Patrol documents pertaining to agency's attempts to control the borders and identify potential criminal activity or illegal immigration satisfied "law enforcement purposes" requirement).

II.     **The Records Properly Were Withheld In Full Pursuant To Exemption 7(A)**

      A.     **DOJ Adequately Has Described The Withheld Records**

Plaintiffs contend that DOJ's "conclusory and generic descriptions" of the withheld documents preclude them from meaningfully evaluating the applicability of Exemption 7(A). (Pl. Mem. at 12.) In particular, Plaintiffs argue that the descriptions of categories 4, 5 and 6 are insufficient to provide a "rational link" between the kinds of documents in those categories and the claimed interference.[9] (*Id.* at 13-16.)

The Court recognizes that "[a]n adequate *Vaughn* index serves three functions: it forces the government to analyze carefully any material withheld, it enables the trial court to fulfill its duty of ruling on the applicability of the exemption, and it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court." *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987); *see also Am. Civil Liberties Union Found. v. U.S. Dep't of Justice*, 833 F. Supp. 399, 402 (S.D.N.Y. 1993) (discussing function of *Vaughn* index) (internal citation omitted). Nonetheless, the Second Circuit has emphasized that, although "the requirements for an index and explanation have been widely recognized as useful tools . . . these requirements are not ends in themselves, but are merely methods or procedures that assist the trial court in its *de novo* review." *Fox News Network, LLC v. S.E.C.*, No. 09-CV-02641 (JSR), 2010 WL 3911453, at *2 (S.D.N.Y. Sept. 14, 2010) (quoting *Donovan v. FBI*, 806 F.2d 55, 58-59 (2d Cir.1986)) (internal quotation marks omitted). Here, for the reasons set forth below, the Court finds that the *Vaughn* index, together with the public and redacted Findlay Declarations, provide sufficient detail for the Court to trace a rational

---

[9] Plaintiffs do not contest the descriptions of categories 1 through 3.

link between the information contained in the records and the potential interference with law enforcement proceedings asserted by DOJ.

First, with respect to category 4 records, Plaintiffs argue that the fact that the documents pertain to one or more law enforcement proceedings does not establish a connection with any interference and, that without more specific information, Plaintiffs cannot evaluate whether documents in this category properly fall under Exemption 7(A). (Pl. Mem. at 14-15.) However, as set forth above, DOJ publicly has confirmed that all of the withheld records relate to one or more pending or prospective enforcement proceedings. (Public Findlay Decl. ¶ 19.) In the *ex parte* Findlay Declaration, DOJ further explains the types of records included in category 4 and expounds upon the harms that are reasonably likely to occur. The Court finds these explanations sufficient.

Next, for category 5 records, Plaintiffs contend that DOJ has not provided any information as to how documents found on the DVD apply to law enforcement proceedings. (Pl. Mem. at 14.) Plaintiffs also argue that DOJ has failed to show that it conducted a document-by-document review of the Category 5 records. (*Id.* at 16.) In response, DOJ asserts that, because the reasons for withholding the documents "relate[d] to their source and the circumstances of their provision to the FARA Unit," no further review is necessary. (Opp. at 14.) DOJ further asserts that revealing even basic information about the type of records or source of the DVD records could reasonably be expected to harm enforcement proceedings by tending to reveal the nature, scope, or direction of those proceedings. (Opp. at 13-14.) The Court finds that "[t]o require further disclosure of information would destroy the purpose of the claimed exemption." *Agrama*, 272 F. Supp. 3d at 49; *see also Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 88 (D.D.C. 2009)

(agency should "disclose as much information as possible without thwarting the exemption's purpose") (internal quotation omitted). Moreover, in the *ex parte* Findlay Declaration, DOJ has further described the category 5 records and provided their source. This additional information is sufficient for the Court to "infer a rational link between the records and an investigative purpose." *Tipograph v. Dep't of Justice*, 83 F. Supp. 3d 234, 239-40 (D.D.C. 2015). Thus, the Court finds that the documents in category 5 properly were withheld in full pursuant to Exemption 7(A).

Finally, for category 6 records, Plaintiffs argue that the description "internal DOJ emails" is vague and provides no basis for judicial assessment of the agency's assertions that release of the records would interfere with enforcement proceedings. (Pl. Mem. at 15.) However, the redacted *ex parte* Findlay Declaration provides significant additional information regarding the types of internal correspondence withheld. (*See* Redacted Findlay Decl., ¶¶ 41-42.) Thus, the Court finds that DOJ has described these records with reasonable specificity.

### B. Interference With Enforcement Proceedings

DOJ has explained the types of harm it predicts reasonably could be expected to arise from disclosure of the withheld documents. First, in the public Findlay Declaration DOJ asserts that premature disclosure of the withheld records could reveal the existence of law enforcement proceedings that are not officially acknowledged or publicly known, which could cause witnesses, subjects or targets to flee, destroy evidence and/or attempt to coordinate their actions or testimony. (Public Findlay Decl. ¶ 21.) DOJ further asserts that disclosure of the withheld records could reveal the nature, scope and direction of enforcement proceedings. (*Id.* ¶ 22.) For example, DOJ states that "withheld records show that DOJ knew certain facts at certain times, or that DOJ sought specific pieces of information from specific sources." (*Id.*) DOJ then asserts that

"[s]ophisticated witnesses, subjects or targets could use . . . [this] information to disrupt an investigation by, for example, attempting to tamper with witnesses, alerting associates about potential government enforcement actions, destroying or altering evidence, or conforming their testimony to known information." (*Id.*) Finally, DOJ asserts that premature release of the withheld records could shed light on DOJ's investigative or prosecutorial strategy. (*Id.* ¶ 23.) In the *ex parte* Findlay Declaration, DOJ expounds upon these harms.

Such "predictive judgments of harm are entitled to deference, especially where, as here, an investigation concerns matters of national security." *Manning v. U.S. Dep't of Justice*, 234 F. Supp. 3d 26, 36 (D.D.C. 2017) (citing *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927-28). Further, the types of harms asserted by DOJ are the same types of harms for which courts routinely allow withholding under Exemption 7(A). *See, e.g., Tipograph*, 83 F. Supp. 3d at 239-40 (allowing withholding based on assertion that public disclosure could result in destruction of evidence, chilling and intimidation of witnesses, and revelation of scope and nature of government's investigation) (citing cases). Thus, the Court finds that DOJ adequately has explained how release of the withheld records is reasonably likely to interfere with enforcement proceedings.

### C.     Recent Events Do Not Undermine DOJ's Assertions Of Harm[10]

Plaintiffs argue that all the investigations pertaining to the individuals identified in Plaintiffs' FOIA requests already have been officially acknowledged or completed, including investigations conducted by Special Counsel Robert Mueller related to Manafort, Flynn, Gates and others, and thus, DOJ should produce documents or reasonably segregable portions of documents that relate to these public investigations. (Pl. Mem. at 24-25.) In response, DOJ argues that the fact that some investigations are a matter of public knowledge does not abrogate DOJ's assertion of Exemption 7(A) because, for example, a given record may relate to more than one enforcement proceeding. (Opp. at 15-17.) DOJ also argues that the news articles and other sources cited by Plaintiffs are not official government statements and thus, are not relevant to the Court's analysis. (*Id.* at 17.)

In their reply, Plaintiffs contend that DOJ erroneously conflates the applicability of Exemption 7(A) with the "official acknowledgement" doctrine, under which disclosure may be compelled even over an agency's otherwise valid exemption claim if the government previously officially acknowledged the information, *see BuzzFeed,* 344 F. Supp. 3d at 407, and argue that the issue here is "whether publicly available information—regardless of its provenance—undercuts

---

[10] For purposes of these motions, the Court assumes that DOJ must show that the withheld records relate to a law enforcement proceeding that is pending or prospective at the time of the Court's decision as opposed to the time the agency responded to the request. *See BuzzFeed, Inc.*, 344 F. Supp. 3d at 405 ("Exemption 7(A) is temporal in nature"). The Court notes that at least one court in this District has held otherwise. *See Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO v. Gen. Servs. Admin.*, No. 97-CV-08509 (LMM), 1998 WL 726000, at *8 (S.D.N.Y. Oct. 15, 1998) ("judicial review of a government agency's decision to withhold documents under Exemption 7(A) must be made in light of the status of enforcement proceedings at the time the agency responded to the FOIA request.") (citing *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991)). The parties have not pointed to any Second Circuit authority on this point and the Court is aware of none. Because I find that DOJ has met its burden under Exemption 7(A) at the time of the Court's decision, I need not resolve this issue.

any argument that the release of documents would interfere with ongoing enforcement proceedings." (Reply Mem. at 13.) Plaintiffs further contend that, even if the official acknowledgment doctrine applies, they have compiled "dozens of official acknowledgments" to which DOJ has offered no response. (Reply Mem. at 14; *see also* Reply Mem. Ex. A.)

"It is well established that a FOIA plaintiff may compel disclosure of information even over an agency's otherwise valid exemption claim if the government previously officially acknowledged the information." *BuzzFeed,* 344 F. Supp. 3d at 407 (internal citation and quotation marks omitted). However, "a plaintiff asserting that information has been previously disclosed bears the initial burden of pointing to specific information in the public domain that duplicates that being withheld." *Id.* The rationale is that, under these circumstances, "any harm the agency fears from disclosure has already been sustained." *Id.* (internal citation omitted).

Here, Plaintiffs have not shown that information in the public domain is duplicative of the information they seek such that no harm would result from disclosure. Indeed, despite acknowledging that some information regarding the Enumerated Persons has been made public. (*see, e.g.*, Redacted Findlay Decl., ¶¶ 8, 17), DOJ maintains that releasing the records reasonably is likely to cause interference with pending or prospective law enforcement proceedings. (*See* Opp. at 16 (citing Findlay Decl. ¶¶ 21-23).) In the *ex parte* Supplemental Findlay Declaration, DOJ supports its continued withholding of responsive records as of February 15, 2019. Further, in a letter to the Court dated June 3, 2019, DOJ confirmed that it completed a re-review of records withheld pursuant to Exemption 7(A) to consider the impact of relevant developments, including the public release of the redacted Special Counsel's report, but that it had not changed its assertions of exemption 7(A) as a result of the review. (Letter, ECF No. 73.) Thus, the Court finds

that DOJ has shown, as of the date of the Court's decision, that release of the withheld records reasonably could be expected to interfere with enforcement proceedings. *Cf. New York Times Co.*, 2016 WL 5946711, at *12 (non-disclosure justified under Exemption 7(E) even if "public domain information" about particular investigations because "an agency does not have to release all details concerning law enforcement techniques just because some aspects of them are known to the public").

III.     **Segregability Determination**

Finally, Plaintiffs challenge DOJ's withholding of the records in full, arguing that DOJ does not sufficiently explain why the documents have been withheld in their entirety based on the alleged harms. (Pl. Mem. at 22.) Plaintiffs argue that "publicly available information about the investigations related to the records at issue make clear that it simply cannot be the case that the disclosure of any portion of any record would interfere with ongoing enforcement proceedings." (Reply Mem. at 14.)

"Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 229 F. Supp. 3d 259, 266 (S.D.N.Y. 2017). "[A]n agency withholding documents under Exemption 7(A) does not need to justify its segregability determination document by document, as the exemption allows agencies to justify withholding based on categories of documents." *Stein v. U.S. Sec. & Exch. Comm'n*, 266 F. Supp. 3d 326, 353 (D.D.C. 2017) (internal citations omitted).

DOJ asserts that the records were withheld in full because it determined that there was no information that reasonably could be segregated. (Def. Mem. at 15 (citing Public Findlay Decl.

¶¶ 24-25).) For example, DOJ explains that high-level information such as who communicated with who, or the date and recipient of external communications could suggest what the government did or did not know and when. (*Id.*) Similarly, DOJ argues that the number of communications between specific people could suggest the government's investigative interests or focuses. (*Id.*) An agency's explanation that records are exempt in their entirety is sufficient to satisfy its segregability obligations with respect to the documents withheld under Exemption 7(A). *See Stein*, F. Supp. 3d at 353 (citing *Dillon v. Dep't of Justice*, 102 F. Supp. 3d 272, 298 (D.D.C. 2015) (finding that the agency satisfied its segregability obligations where agency explained that certain records were exempt in their entirety under 7(A))).

In response to Plaintiffs' argument regarding newly public information, DOJ argues that the release of any portion of the withheld records could cause the same harms that would result from disclosure in full, for example by revealing the existence, nature, or scope of enforcement proceedings or the government's strategy in such proceedings. (Opp. at 11 (citing Findlay Decl. ¶¶ 21-23, 25); *see also* Def. Mem. at 12-13.) DOJ's argument appears to be that releasing portions of the records, which are finite in number and relate to a finite group of individuals and entities, would reveal whether and to what extent the withheld records relate to other investigations that are not officially acknowledged based on the records that remain withheld. (*Id.*; *see also* Def. Mem. at 13.) Thus, DOJ argues that, while it did not assert a *Glomar* response in this action,[11] similar considerations apply. (*See* Def. Mem. at 13.)

---

[11] Under what is known as the *Glomar* doctrine, "an agency may, pursuant to FOIA's statutory exemptions, refuse to confirm or deny the existence of certain records in response to a FOIA request." *Wilner*, 592 F.3d at 67.

The Court finds that DOJ adequately has shown that, despite recent developments, the withheld records are exempt in their entirety. Just because some investigations are publicly known does not mean that the release of documents related to those investigations are not likely to interfere with ongoing or pending law enforcement proceedings. As other courts have recognized, "Exemption 7(A), by its terms, applies whenever production of law-enforcement information 'could reasonably be expected to interfere with enforcement proceedings'—full stop." *STS Energy Partners LP v. Fed. Energy Regulatory Comm'n*, 82 F. Supp. 3d 323, 333 (D.D.C. 2015) (quoting 5 U.S.C. § 552(b)(7)). "Hence, so long as 'enforcement proceedings' continue against someone, it matters not that proceedings have ended against someone else." *Id.* (citing cases). Moreover, Plaintiffs have given the Court no reason to believe that DOJ has acted in bad faith. *See Agrama*, 272 F. Supp. 3d at 49; *see also Kuzma*, 692 F. App'x at 35 (plaintiff's "unsupported personal opinion" that it was unlikely that an investigation was pending was not evidence of bad faith) (internal citation omitted).

## CONCLUSION

For the foregoing reasons, the Court finds that the records properly were withheld in full pursuant to Exemption 7(A). Thus, DOJ's motion for partial summary judgment is GRANTED and Plaintiffs' cross-motion for partial summary judgment is DENIED. The Clerk of Court is respectfully directed to close the open gavels at ECF Nos. 42 and 49. In view of the Court's disposition of the cross-motions, as well as the parties' agreement approved by the Court on November 9, 2018 (*see* Memo Endorsement, ECF No. 41), the parties shall advise the Court within seven (7) days as to the issues remaining in this case, if any.

DATED:      July 22, 2019
             New York, New York

**STEWART D. AARON**
**United States Magistrate Judge**